The case for arguments this morning is 15-1870-M-I-LLC. Mr. Crane, whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. For any of the eight or more reasons that we've briefed, the District Court's orders should be vacated. This morning, I'd like to use my time to focus on four key issues. Number one, the District Court misconstrued the term first green. A proper construction of that term means that there is no infringement of either of the alleged claims, the asserted claims. Two, as to Claim 16, which is the only claim that the District Court found was likely infringed, the District Court erred in construing and in finding infringement of the degassing chamber limitation. Three, the claims are not entitled to a 2007 filing date, and if M-I is correct about infringement, the claims are invalid because they contain a bar. And finally, the equitable considerations overwhelmingly point against the entry of an injunction. M-I's limited allegations of irreparable harm are based on speculation, and the unrebutted evidence is that the injunction will put my client, FP, out of business without it staying in court. What is, as an aside, a quick aside, what is the current status of these proceedings? Is anything being scheduled? Are things moving forward? Things are moving forward in the case. We've intervened, our Canadian parent has intervened to assert claims. We've asserted counterclaims. There is a scheduling order in place. The injunction has stayed. So turning first to Claim 16, again the only claim that the District Court found was likely infringed, the Court construed two elements of Claim 16, the terms first screen and the terms degassing chamber, and found that both are present in the back screen, my client's product. I will talk about each of these in turn. The District Court construed the term first screen to mean any screen in a series of shell shaker screens, including the last screen. Claim 16 requires that a vacuum be applied to the first screen of the shell shaker to enhance the flow of drilling fluid through that screen with respect to a second screen that specifically does not have a vacuum applied to it. MI's argument stands or falls on this notion, that the terms first and second are always used generically in patents, and convey generally, and specifically as to their patent, the 288 patent, no sequential meaning. Where in the Claim 16 does it have any kind of physical location description? The physical location, well, it describes the location as first in the claim itself. The first screen is identified in the claim itself, and something occurs in the first screen with respect to the second screen. But you'll have to go back to the specification to find the specific definition of the first screen. So you want us to limit the claim to the specification? I want you to read the claim in light of the specification, which as the Court has indicated, is often determinative as to the definition of particular terms within the claim. If we agree with your grim that first screen, second screen, and the claim language is broader, is there anything in the specification that specifically narrows it, or are they just examples? Well, if the Court is asking does the specification say first screen is defined as, no it doesn't. You have to derive the definition from the entirety of the specification. You start with the claim language, right? The claim language doesn't seem limited in any kind of physical aspect. Do you agree with that? We have to get to the specification to have any kind of physical limitation. I would respectfully disagree, because Your Honor, we have submitted expert testimony from an expert in the field who would tell you that a person of ordinary skill in the art of shell shakers would read the term first screen and always hear that term as the first screen in a series of shaker screens. Of course, as I think your opposing counsel has pointed out, the use of the term first screen is really not so much a question of what a person of skill in the particular mechanical art here would interpret it to mean, but more it's a patent convention. That's their argument, so I'm not sure how useful the view of a person of skill in the art is when you're talking about terms that have patent convention uses. Well, Your Honor, of course the term has patent convention uses, but another case that approached the same issue is the Aplera case. And in the Aplera case, the definition of first and second vacuum chambers in a spectrometer was made relative to the position of those vacuum chambers in the flow of ions. In this case, there is a flow of slurry across several screens, progressively becoming less and less because of the effect of the screens. And what they have invented in their invention is the notion that under that first screen, as demonstrated in their various illustrations, they place a vacuum to improve, to enhance the flow under that particular screen. So the fact that there is a patent convention, which I admit there is a patent convention, but that patent convention is not absolute, and there is no case saying that it is absolute. And in fact, there are cases where you derive the meaning of the specific terms by their description in the specification, which is precisely the case here. Let me ask you if you can turn to the degassing. I can. As I looked at the record materials, it seemed to me that the following was reflected in the record. At least viewing the record most favorably to the findings made by the district judge. First, that the 959 patent is your patent, and second, that there is evidence that the back screen was a commercial embodiment of the 959 patent, and that the 959 patent has a degassing function that's performed by the, I think it's numbers 51 and 52 in figures 2A, 2B. Right. And that your, the materials, I guess it's a manual of some sort, describe the degassing function performed by the back screen. Why isn't that evidence sufficient to support the district court's conclusion that degassing in some form of degassing chamber is performed by the back screen? For several reasons, hopefully I can keep them all in my head, Your Honor. One is that the degassing chamber is a very specific thing in the 288 patent. If you look at the patent prosecution history, MI went in with just a chamber, and the PTO limited them to a degassing chamber. And it's a very specific spot in which the degassing must occur. And if you look then at the 288 patent, and you see how they diagram their schematics, how they diagram the drawings, you'll see that they identify the degassing chamber as a separate component from the flow line connecting that degassing chamber, again, a very specific thing performing a very specific function, from the sump that is drawing the fluid and air underneath. If you juxtapose that against what the district court found here, the district court found that a flow line with air or liquid separation, water or air separation, performs the same function as that highly specific degassing chamber. So what the district court did was look at some elements of our device and say, there, there's fluid or air separation, therefore, that part, the flow line, in combination with a tank, performs the same function as the degassing chamber, which is very specific and very limited in the 288 patent. Let's turn to the 959 patent. At column 8, lines 59 through 62, I guess it is, is the reference to the figures that I mentioned, 2A and 2B. And it says, so a preferred environmental fluid separation system having a multistage fluid solid separation. In this system, a primary accumulator, tank 51, which is the tank I was referring to, enables first stage fluid gas separation. Tank secondary accumulator 52 provides secondary fluid gas separation. And that tank looks an awful lot like the tank that shows up in your drawings of your figures of the back screen. Why isn't that enough? Given your experts or your representative's admission that the 959 is embodied in the back screen, why isn't that enough right there to show that there is a chamber that does the fluid, the gas extraction? Well, there are a number of claims within the 959 that don't talk about fluid or gas separation. But fundamentally, the problem here is that the court, the district court, construed two elements, the fluid or gas separation, and combined them into a very specific degassing chamber. The fact that the drawing itself looks similar can't allow us to avoid the court's finding. Well, it looks similar, and it is described as a fluid gas separation in the patent. It is described as a fluid or gas separation. Now, I don't believe there's anything in the record, and certainly nothing that the court relied upon, to determine that fluid gas separation is the same fluid or air separation is the same thing as the specific degassing function that is described and trumpeted, can't blame the 288 patent. You think fluid gas separation is not degassing? I don't know. I honestly don't know the answer in terms of what MI determined the degassing or described in their patent as degassing. I'm going to turn back to the issue regarding the first screen very quickly and point out again, I've already discussed a plera and the examples within the patent, within this investigation that we've briefed, that identify where it is that first screen is defined in the specification again and again. I'll end by pointing out that the 959 patent issued over the 288 patents, two weeks after the 288 patent issued, the 959 patent issued, in which we claimed the application of vacuum to up to one third of the entire shaker bed, which would include the last screen where the vacuum is located. That's important because MI has never commercialized its product. Its first screen technology didn't work, our last screen technology does work, and they know that because they marketed and evaluated our product for over two years and recognized the value of adding vacuum to the last screen as opposed to the first screen. Again, I think I've covered degassing chamber. Again, I would point out that the district court does take two elements and combine them to say they perform the same function, even though MI has only pled literal infringement. I'm going to pass over validity and go to the equitable considerations for the reign of my time. The district court's finding of irreparable harm are based on speculation. There's no evidence of MI's lost sales. MI entered the market with the screen pulse, its product, just a few weeks before the injunction hearing. MI presented no evidence of sales, much less lost sales, and it presented no evidence, essentially because it couldn't, of lost market share. None of this harm can be presumed. But we're looking forward when we're talking about irreparable harm, right? You are looking, yes, Your Honor, you are looking forward as to what is the likely harm to come. But in every instance where there's been a finding of irreparable harm, every case that they cite, including Bosch, the Bellwether case, there is evidence of irreparable harm presented in terms of actual losses, actual market share loss. And on this record, there is none. Well, how could they have any if they just entered the market? They couldn't, Your Honor. We don't know what impact there could be. We don't know what the market share impact is. Your view is, then, is if they've just gotten a patent and just entered the market, they're never entitled to an injunction because they can't show harm? I think it would be difficult to be entitled to an injunction, Your Honor, when you cannot show harm, yes. Isn't that precisely the point where you actually might need an injunction, where you haven't established a market share, and you're a new company asserting a new patent right, and it will destroy your market share if you are forced to compete? I think, with respect, that presumes the success of your product in the marketplace. That presumes you're going to establish a role in the market to have an impact on. The fact that you've invented a product that you believe will displace another product, even an infringing product, that's not tested. That's not presumed. That can't be presumed. There's no case allowing that to be presumed, Your Honor. You want to say you're into your rebuttal time. I am in rebuttal time. I want to make one quick point, and then I'll end for now. Again, every case they cite, including Bosch, had evidence of market impact, and the undisputed evidence is that we have provided evidence for ability to pay and that this injunction would put our company out of business, which is precisely the thing that the court commented on when it commented on the reliance upon windsurfing in a similar case, where the court indicated that at this stage, not a permanent injunction phase, but at a preliminary injunction phase, we should be very wary of putting the company out of business. Thank you, Your Honor. Thank you. We'll restore two minutes for rebuttal. Thanks. Mr. Cavill?  Thank you, Your Honor. May it please the Court. Let me address a couple of things that my opposing counsel has raised, particularly on the first screen. Where I think we ended up, after your question, Judge, is that there is nothing in the claim language that says this is the location of the first screen or the second screen. It is used as a common patent convention. We ended up in reliance on expert in a plera. And I think a plera, even though it's only a district court case that I'm finding here, is instructive because in a plera, what Judge McKelvey found was, based on just the specification in the claim language, you wouldn't have a location limitation. But in the file history, there was a specific argument where the patentee said, because to get around this prior art, we have to have things in this location. First has to come before second. That's the only reason that they found it. In this case, there's been no evidence. There's no argument that anything in the specification limits first to the inlet side. And the other most important thing is what they're calling a definition is just a description of an example. And in the example, it uses the terms first and last, two screens, which are not the claim terms they're saying are defined. In the claims, it says a first screen and a second screen. These are not technical terms. These are terms of patent convention. It should be given their ordinary meaning. The district court got it exactly right on the claim construction. So they first screened the second screen. It just distinguishes two screens, regardless of location, where the first has a pressure differential and the second does not. The issue on the degassing chamber, there is no limitation to a specific degassing chamber. In fact, what the patent says about the degassing chamber in the 288 patent at column 11, which the judge down below relied on, at lines 8 to 9, it says degassing the drilling fluid may be performed by any method known in the art. So what happened down below was FPUSA tried to come in with an expert declaration and say, no, degassing is limited to a specific type of degasser. The district court properly rejected that and then found, just as the court has said, from their own admissions in their saying that the patent covers their commercial embodiment in their marketing material from their own expert's prior report, they said that the degassing chamber was part of the vacuum screen system. So there is nothing that would say there isn't a degassing chamber. On the preliminary record the court had, there were multiple admissions, multiple things that said we do have the degassing chamber. This issue of performing the function is just a side because the district court, responding to language that counsel for FPUSA raised in their motion for reconsideration, in their motion for reconsideration they asked him to reconsider and said there's no showing that this performs the same function that's in the patent. And in the district court's order on reconsideration he used those words. They've now latched onto that to try and say, oh, he did the wrong analysis. Do you, is it your view, as it seems to be the district court's, that the degassing is performed by the vacuum line or do you take the view that the degassing is performed principally in the chamber that you identify at 377 in your, one of your exhibits as being number 50? Yes, I think if you look at the language of the claim limitation, it says a degassing chamber in fluid communication with the pressure differential generator. I think the fluid communication is the line and the chamber is the tank. So I think the district court found all of those were literally met. Well, but the district court seemed to have focused on the line as being the degasser or the degassing chamber, at least that's the way I read the district court's opinion. When I looked at the argument that you were making, it seemed that you were making the argument that the tank, 50, is the degassing chamber. That is the argument we made and I think the district court. Do you detect that the district court is focusing instead on the line as opposed to the chamber or what do you make of that, of that language from the district court's opinion? I think the district court recognized that was the fluid communication that was required. So it's a system claim, it requires the chamber, it requires the fluid communication and I think the district court was reacting to language in the defendant's reconsideration brief which said there's no evidence that the line and the chamber perform the same function. And I think while the district court language was maybe less than perfectly clear between the two orders, he was very clear that it's the tank, the line for fluid communication, and then responding to their position, he said these perform the functions required in the patent. The 959 issue that they raised, by the way, was not raised below. This idea that there's a specific location in the claims was not raised below for the degasser. So as to claim 16, I think the district court was very clear, got it right on first and second screen. It's clear from the claim in the spec, there's no need to go outside of those, what first and second mean and the degassing chamber is admitted. So I think infringement, the likelihood of success on claim 16 is very well established. As to claim 1, first and second was their primary argument, it falls the same way. They argued that they were not practicing the method and they were not controlling the air flow. Those were the total of the arguments for non-infringement down below. But the district court never found infringement. The district court got slightly sidetracked. The district court... Can you just answer my question before you explain it? Yes. The district court never found literally infringement on claim 1, right? Chief Judge, I would say that inherently in the reconsideration order and saying that they are enjoined from infringing claim 1, he did find that claim 1 was met. He addressed in his first order the two non-infringement arguments that they made, which were first screen and controlling air flow. And what he didn't do, he latched on to their expert report, which had one element that said flowing slurry over the screen with the pressure differential. And he said, I don't need to decide that now. And then they came back and they moved for reconsideration. And in doing reconsideration, I believe he inherently found that no reasonable person could find they weren't flowing slurry over the last screen and that's why he did it. But I will agree that that's not expressly written in the order. I think this court could find, based on the multiple admissions that they've made, even in their most recent briefs, but in their opening brief, they repeatedly say there's slurry flowing over the last screen. So to any extent, that's the missing piece that the district court didn't specifically say. I think this court could say there's no reasonable way to see it otherwise. They've admitted it, that it's slurry. Slurry is defined in the patent. The district court adopted that as a mixture of drilling fluid and cuttings, and that's the whole purpose of both devices is to pull more drilling fluid off the cuttings. So I think this court could say to any extent the district court needed to expressly state that, that could be done on remand or this court could find that no reasonable person could find otherwise based on their own admissions. As to the irreparable harm, if I can go there, the defendants admitted repeatedly until their last brief that they've submitted in this court that this is a two-player market. And what they've said now is, well, there's no evidence, and you're quite right, Judge, this is a going-forward-looking case. And they said there's no evidence that there's lost market share or lost sales. Well, in an admitted two-player market, which they've repeatedly said, there is no other thing that could happen, but there will be lost sales. And along with that, the lost opportunity to sell other goods and services, which there is evidence in the record of, and I put in a declaration saying, when we're on the rig and we have the opportunity to sell this device, we also have the opportunity to sell other things, such as more drilling fluid, shakers, replacement screens, many other things. All of those will be lost if they're allowed to continue in this market. The loss of exclusivity, I mean, that's a common patent thing, is we have the right to say that we're not going to license others to use our technology. We have the right to market as we're the exclusive supplier. In fact, one of the things that's not accurate in the way counsel portrays this is they say, well, we've been out there in the market, and now MI is changing the status quo. The actual status quo was MI was selling a product called the Maximizer and renting some of their screens. So MI was the only brand name known. And only when MI found out they were going to start selling on their own and this patent came out, that changed the status quo. And so the status quo is being maintained by the preliminary injunction. There's also the, in addition to the loss of exclusivity, the lost sales, the lost things that go along with the sales, the ability to brand our things ourselves, there is the danger of their inability to pay. Despite counsel saying that that's not a factor in irreparable harm, it is a factor because they've repeatedly said now they only have 45 days of operating cash. And so if they're, in fact what they've said is the only way we could pay a judgment is if we're allowed to go forward and keep selling the infringing product so that at the end of the case we could pay for that infringement. And that's certainly not what's intended and why you can't get a preliminary injunction. As to the... Well, in the evidence of, you rely on the Dun & Bradstreet evidence as your evidence of the weakness, financial weakness of the defendant. That seemed a little on the thin side to me. You have nothing else, I take it, other than their assertion that they have, they're at risk if they're enjoined from continuing financial... Yes, Your Honor, and I agree with you that that is our evidence, those two things, in large part because the defendant is in control of what they put in. And we argued down below that we think this is a company that has risk. We think because they have a Canadian parent and they don't have cash, that's an issue on irreparable harm. They came in only with a declaration that said we would be put out of business. It kind of blurred sales between Canada and the U.S. But they did have a revenue figure, I think, for U.S., if I recall correctly, as well as projected revenue figures. I saw revenue, I didn't see profits. Right, correct. Was there any discovery in this case? I assume not. There was not. And this is preceded entirely on the papers. Yes, this was a preliminary record. And in fact, the court offered at the end of the hearing on this issue, we had asked to present live witnesses. The court said it didn't have time, but it would give us another day, we could come back, present any additional evidence. Both counsel agreed that the record was complete, and the court did not need to do that. But I think really it shouldn't be held against us that defendant hasn't come forward with any financial records, profit statements, loss statements, anything to verify what they're saying. All we could get was the public record, which is the Dun & Bradstreet that says they're at risk, without further discovery. Now, this is a preliminary proceeding. I don't think there's any clear error in the way the court looked at this and found that there was a record of harm on the record that it had on a preliminary basis. But I do think it's important, that second issue that you raised, Judge Bryson, is they have been, what they're saying is we've been in business since 2012, it's now late 2015, and we only have 45 days of operating cash, or we're going to go out of business. I think that can be considered as record evidence that there's real danger that they're not going to be able to pay a judgment. I'm not really conversant with the system that Dun & Bradstreet uses to report these, and so it struck me, just looking at the particular item that you relied on, that there is perhaps some seeming tension, which the other side has pointed to, between the financial stress class rating for Dun & Bradstreet being 4, which is next to the highest risk, and their risk of severe financial stress as being 0.84%, and in particular I was a little confused of risk of severe financial stress for businesses with this class. Can you interpret that for me in a way that makes sense to the lay reader? Sure. What Dun & Bradstreet does, as I understand it, is they try and look at similar businesses. So if you're selling a service in the oil field in this particular, they'll try and find comparable. I understand. I need to skip, because I wasn't real clear about the point that I was really asking you to direct your attention to. The risk of severe, this is at A431, risk of severe financial stress for businesses with this class is rated at 0.84%, presumably very low. Is that a reference to the general class of businesses as opposed to this business, or is that a reference to this business within the general class, if my question is clear? I do. I think it's a reference to this business within the general class. Notwithstanding that they say there's a 4 out of 5 financial stress for this business, nonetheless, the risk of severe financial stress, such as insolvency and bankruptcy, is 1% or less. I think that's what it's saying, although I think what it's saying is for small businesses of this size, it's typically not at the highest risk in terms of bankruptcy, but it's not addressing all the factors because it's not a public company. So Dun & Bradstreet can only get the information that's given to it. So you think your interpretation of the risk of severe financial stress number is a number specific to this company, not to the class of companies within which this company falls. Is that what I understood you were saying? So let me be clear now as I'm looking at it again. It's the financial stress class, and then the risk of financial stress for businesses with this class talks about 84 per 10,000. So I do think that's the general class that it's talking about. It's not talking about the business. Yes, I do. Right, I agree. Now that I look at it, when it says 84 per 10,000, I think it's talking about the class overall, not this business. Any final comment? No, Your Honor. I think I would say that in terms of cases where a preliminary injunction is warranted, this is about one of the strongest I've seen. There's a very high likelihood of success. There's been essentially no invalidity challenge raised. The only prior art they assert is to say that their own device anticipates if we don't get the support for the claims. And in the record on the spec, in the various other items we've pointed to, there's plenty of support for the limitations. So I think there's essentially no invalidity challenge, a very strong infringement case. And then on the equitable factors, I think they lean our way or at best are even on that one issue because of the claimed risk, even though they didn't provide any financial data. So overall, I think the district court got it exactly right on the merits. I would ask that this court affirm. If I could just ask one further question. Now, this is in the nature of the specific challenges to the injunctive order. There are several procedural challenges, one of which is the reliance on claims 1 and 16 as opposed to simply 16 for the injunction. Another is the failure to include the specific injunctive terms within the single document as the circuit law seems to require. And third of the principal objections, I guess. Third, let's see, was the... Oh, yes, the simply enjoining against infringement as opposed to enjoining the back screen or colourable imitations of the back screen, which is the normal way that injunctions are framed as opposed to the disapproved injunctions that say don't infringe. You don't want to put somebody at risk of contempt on an instruction that big. Can you comment on whether the injunction needs to be reformulated for any one of those three reasons? I don't think it needs to be, but I think the Mangy's case, which we've pointed to, is instructive in saying that this court can affirm on the merits and say the district court got it right and just remand with instructions if it needs to to say this should all be in one order with these items addressed. This issue of in a single order, I think, could be easily handled on remand with direction from this court. On Claim 1, as I've said, both of the arguments that they raised below were addressed by the district court. This one issue on the slurry at last screen with the pressure differential generator is one that they've admitted repeatedly. If we disagree with you on Claim 1 and we feel that Claim 16 is the only one on which the district court made a finding, which is likely a success, you presumably would have no issue with our confining the injunction to Claim 16? I think this court could affirm the injunction on 16 and then address any issues on the formalities of the order on remand. And in terms of the last issue, the injunction against infringing as opposed to the injunction against the back screen? Well, the injunction does say the back screen. I thought that it was broader than that. Well, it says that in part, but then it goes on. It says, enjoys defending from promoting, selling, or renting any back screen. And then, of course, the killer language is, or any other system which infringes 1 and 16. So in effect, the district court is just enjoining infringement. In effect, I think the district court could have used any colorable version of the back screen and that would have been artful language. And I think this court can certainly direct the court to do that. I think it's kind of a strawman issue because they've repeatedly said, we only have one product. It had the same embodiment since 2010. It's never changed. It's current. So when the court says, you're enjoined from selling the back screen, I think it's very clear they know exactly what the order is. But I agree, it could be something that could be cleaned up below and just say, or any colorable version. Well, but it could matter if, for example, they tried to design a round which was more than a colorable imitation of the back screen. But nonetheless, if you contended it was still infringing, they could be not only on the hook for infringement, but they could be on the hook for contempt if the district court found that it's infringed under this order, but not under a back screen or colorable imitation. I think we'd be in the same position, Judge Bryson, because we'd be arguing about whether the supposed non-colorable difference that they allege doesn't infringe, whether it infringes or not, and we'd be arguing about is it non-colorable and still infringes. Right, but the difference for the defendant would be that the consequence of that argument in the context of an order that talked about infringing would be that they would be subject to contempt as opposed to you are making a new argument of infringement in the context of an order that says don't sell the back screen or a colorable imitation, in which case you would simply have a new infringement case. And that makes a big difference for the defendants. We would have a new infringement case if we agreed that it was not colorably different, right, that it was somehow further afield, then it would be a new infringement case, otherwise it would be a contempt. If you thought it was a colorable imitation and you went to the district court and the district court said, no, it isn't, but I still think it infringes, then you would have no contempt, whereas you would have with the broad injunction and you would have arguably an infringement action. I see your point, and that's why I conceded earlier the language could have been more precise, and I think this court can direct the district court to just uphold the injunction and correct that language. Thank you. Thank you, Your Honor. I'll restore my time if you need it. Thank you, sir. Thank you, Your Honor. First, I want to make sure that we're clear on what the court found regarding Claim 1. He specifically said, I need not decide whether the back screen performs the second step, because he found infringement of Claim 16, and then he cited to Abbott saying, in order to show a likelihood of success in the merits, a plaintiff need only show that he proved that one claim is infringed. Second, the actual language that the court used regarding the degassing chamber, Your Honors, is that it performs, that the degassing chamber in the 288 patent, quote, quote, performs the same function as the vacuum line with a fluid or air separator, which is connected to a collection tank. So he specifically identifies, almost in toto, the fluid line as being the degassing chamber, and conflates those two items into becoming the very specific degassing chamber. Next, I want to talk about the availability of money damages even in a two-player market. And essentially what M.I. has argued is, because of the two-player... If I could bring you back to the degassing. Yes, sir. Sorry to spend so much time on this, but it does seem to be an important issue. You don't... I'm not sure whether you deny or not that the vac screen contains the degassing chamber. I mean, some kind of degassing, let me not use chamber, some kind of degassing functionality. Is that right? The vac screen, I think it is safe to say that any item that is moving fluid from one place to another incorporates the notion of degassing at some level. Is it the very specific degassing function identified in the 288 patent? I don't know, Your Honor. I would suggest not. And it does not occur in the very specific chamber that the 288 requires. The 288 patent is labeled as a degassing invention. And many of its embodiments talk about the function of pulling the gas out of the shell shakers to avoid the noxious gases being exposed to workers and the dangers of that. So it identifies that as a very special function. Regarding the two-player market, I think an instructive case for the Court to consider is Lamb v. Johns Manville, which is cited on MI's table of authorities. And this Court noted in that case where Lamb, the plaintiff, fled, market erosion, lost sales, this Court said the profits lost by the patent owner in a two-supplier market is a proper ground for awarding damages. So the presumption or the suggestion that there's some sort of presumption that in a two-player market, damages, lost sales, are presumed to be irreparable is not true. Money damages have been awarded in similar cases over and over again. Last, I want to focus on the notion of MI's lost sales and where we are in the process. MI says, and it's brief, that it introduced the ScreenPulse to the market in 2014. As of the time of the hearing, MI produced literally no evidence of lost sales or lost market share, despite it saying that it entered the market with the product in 2014. The sequence matters because they evaluated our product in 2010, they began marketing our product as their own in 2012, and when we turned down their offer of $27 million for our technology in late 2014, they took this first screen patent and sued us for infringement with our last screen product. And during that time, when they were marketing our product as their product, as the Maximizer, painting it with the MI SWACO colors and exposing it to the marketplace, they didn't gather data of their lost tag-along sales or what those tag-along sales might be because when they submitted their affidavits, all they said was there may be lost tag-along sales without identifying what those sales would be and what particular items would be sold. So the suggestion that on the record they've demonstrated irreparable harm, severe, immediate, irreparable harm, is simply not true. There is no evidence on the record of irreparable harm that they face. Thank you, Your Honor. Let me ask you one final question. Now, on the question of ability to pay, the evidence, I guess, is a little thin on both sides of that. They have it done in Bradstreet. You have a declaration from Mr. Russell that has a reference to revenues of FPUSA and the worldwide and U.S. revenues. But I didn't see anything that reflects profits. I mean, you can have a lot of revenue and still be in big financial trouble. But $6.4 million worth of revenue and yet having only 45 days of cash reserves seems to me not to necessarily suggest that you're in the pink. Well, two points, Your Honor. One is there was other evidence submitted during the bond proceeding which occurred subsequently, admittedly subsequent to the initial hearing, but when the court requested information on the bond, we provided further financial information. Now, is that anywhere in the materials before us? It is in the materials before you. I'll get you a precise cite. But I didn't see a reference in the briefs as a support for the idea that you have a better showing for your... I believe it's referenced in a footnote of our brief, Your Honor, but let me get my counsel to help me out. Well, that's all right. That's... Okay. But as it stands, we don't know today what damages will have to be answerable for. We don't know what that quantum is. There is some quantum out there that assuredly we can't afford to pay. But right now, there's no record before this court or for that matter before the district court as to what MI's damages are. So you're measuring our ability to pay against an unknown number, an unevidenced number. We do have... We have said and we do believe we have 45 days of cash if tomorrow we're not allowed to sell our product. Okay. But that product is a success and we can anticipate some sales growth although we are a relatively limited player in the market. Next to MI, if they point out, they point out that we have only four screens in the marketplace, which suggests, of course, the de minimis impact that we could be having on the market. So if you look, for example, at their briefing on the amount of bond, they suggest $250,000 because they anticipate that is our loss profit on our sales during the course of litigation. Given the relatively small size of us in the marketplace and the fact that they produce no evidence of actual lost sales, it's very difficult to match up our ability to pay with this imaginary number. I think your colleague may have identified something for you. Yes. So on A1089, our financial expert admittedly in connection with the bond briefing in paragraph 13 has the EBITDA of FPUSA. Oh, yeah, I saw that. But again, we don't have anything that shows actual profits, right? I don't think we submitted evidence of actual profits, Your Honor. Thank you. I thank both counsel for participating. That concludes our proceedings for this morning.